United States Courts
Southern District of Texas
FILED

FEB 1 3 2002

Michael N. Milby, Clerk of Court

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **IN RE** | § | |
| | § | |
| **LATTICE COMMUNICATIONS, INC.** | § | **CASE NO. 01-80358-G3-11** |
| | § | **(Chapter 11)** |
| **DEBTOR** | § | |
| | § | |

## DEBTOR'S DISCLOSURE STATEMENT

COMES NOW Lattice Communications, Inc., Debtor herein, and files this Disclosure Statement pursuant to the provisions of 11 U.S.C. §1125.

## I
## INTRODUCTION

"Plan" means the Chapter 11 Plan Proposed by the "Debtor" as well as any subsequent amendments or modifications. Information contained in this Disclosure Statement summarizes the Plan and should not be solely relied upon for voting purposes. Creditors and Interest Holders are urged to read the Plan carefully and are further urged to consult with their counsel in order to understand the Plan fully. The Plan is a legally binding document and is based on complex legal and financial considerations.

**IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CREDITORS AND THE INTEREST HOLDERS UNDER THE PLAN PROVIDES A GREATER CHANCE OF RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES, UNDER THE CIRCUMSTANCES, FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN WOULD BE IN THE BEST INTERESTS OF CREDITORS, AND RECOMMENDS ACCEPTANCE OF THE PLAN.**

### 1.01 REPRESENTATIONS.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF CREDITORS AND INTEREST HOLDERS OF THE DEBTOR. NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION OR INDUCEMENT THAT IS NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR THE DEBTOR, WHO WILL INFORM THE COURT, WHICH MAY TAKE SUCH ACTION AS IT DEEMS APPROPRIATE.**

F:\Files\PHT\Lattice\disclosure stmt. true and correct.wpd

39

THE PLAN PROPONENT DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM THE RECORDS OF THE DEBTOR, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES.

THIS STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH CREDITOR AND INTEREST HOLDER IS URGED TO REVIEW THE PLAN.

THE PLAN PROPONENT MAKES NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS UNDER THE PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED.   ANY TAX INFORMATION CONTAINED HEREIN IS MADE FOR INFORMATION PURPOSES ONLY. PARTIES-IN-INTEREST ARE URGED TO SEE THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS SHOULD THEY HAVE ANY QUESTIONS WITH RESPECT TO ANY TAXATION ISSUES.

THE CONFIRMATION OF THE PLAN WILL DISCHARGE THE DEBTOR FROM ALL DIS-CHARGEABLE PRE-FILING DEBTS BY VIRTUE OF THE ORDER OF CONFIRMATION OR SECTION 1141(d) OF THE BANKRUPTCY CODE. IN ADDITION, OTHER RIGHTS OF CREDITOR'S ARE ALTERED BY THE PLAN. CONFIRMATION MAKES THE PLAN BINDING UPON ALL CREDITORS AND OTHER PARTIES-IN-INTEREST, REGARDLESS OF WHETHER OR NOT THEY HAVE ACCEPTED THE PLAN.

ALL INITIALLY CAPITALIZED WORDS USED IN THIS DISCLOSURE STATEMENT HAVE THE SAME DEFINITIONS SET OUT IN ARTICLE I OF THE PLAN.

**1.02 Source of Information and Accounting Method.** The financial information contained in this Disclosure Statement was compiled primarily from information provided from the accounting and business records of Debtor.  Accounting is on an accrual basis in accordance with generally accepted accounting principles.  Currently, the Debtor's books are maintained by an in-house accountant with tax and other reporting documentation prepared by Patricia Bruen.  In preparation of this Disclosure Statement, Debtor investigated the condition of Debtor's books and records and believes that the financial condition of the business is accurately reflected in this Disclosure Statement.

**1.03 Explanation of Chapter 11.** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon filing of a Chapter 11 petition, Section 362 of the Bankruptcy Code provides for a temporary automatic stay of all attempts to collect claims that arose prior to the Filing

Date, or otherwise to interfere with the Debtor's property or business, in order to permit the Debtor to attempt to reorganize.

Formulation of a Plan of Reorganization is the primary purpose of a Chapter 11 Reorganization Case. A Plan of Reorganization sets forth the means for satisfying the holders of claims against, and interest in, a debtor. Confirmation of a Chapter 11 Plan of Reorganization requires that either (i) all classes of claims and interest entitled to vote accept the plan or (ii) that the plan be accepted by the holders of at least one impaired class of claims not counting the votes of claims held by "insiders" within the meaning of the Bankruptcy Code and that the Plan be confirmed as to each objecting class pursuant to section 1129(b) of the Bankruptcy Code (the so called "cramdown" provisions). In addition to the acceptance requirements, Section 1129 of the Bankruptcy Code contains additional criteria that must be satisfied before a Bankruptcy Court may confirm a Plan of Reorganization. **See "Confirmation Standards and Procedures."**

Confirmation of the Plan under Chapter 11 will relieve the Debtor of liability for any and all of the Debtor's pre-confirmation debts except as provided in the Plan, the Confirmation Order, or Section 1141(d) of the Bankruptcy Code. Confirmation makes the Plan binding upon the Debtor and all Creditors, whether or not they have accepted the Plan.

**1.04 Procedure for Filing Proofs of Claim.** The Plan provides that Claims will be recognized only if evidenced by a filed proof of claim that is allowed by the Court, or if the Claim appears on the Debtor's schedules filed with the Court and is not listed as disputed, contingent or unliquidated. In addition, the Bankruptcy Code permits the Debtor to ask the Court to reject unexpired leases and executory contracts. The Plan provides that the party to any such lease or contract which is rejected must file a proof of claim for damages no later than thirty days after the entry of the Order authorizing rejection of the lease or contract. Any party-in-interest may object to any claim. However, an unrecognized claim may be subsequently allowed and ordered paid by the Court. Debtors schedules may be reviewed in the Office of the Clerk of the Bankruptcy Court during regular business hours.

**1.05 Voting.** In submitting this Disclosure Statement, The Plan Proponent is not seeking the acceptance of the Plan by the Creditors in Classes which are unimpaired by the Plan. Unimpaired Creditors are not entitled to vote on the Plan. Members of Classes which hold impaired claims are entitled to vote to accept or reject the Plan. If any Class elects to reject the Plan, Claims in that Class may be treated according to the cram-down provisions of section 1129(b) of the Bankruptcy code. **See "Introduction - 1.03 Explanation of Chapter 11." and "Confirmation Procedures and Standards - Cram-down".**

**1.06 Classes Impaired Under the Plan.** Classes 3, 4, 5, and 6 under the Plan are impaired and are eligible to vote to accept or reject the Plan subject to the limitations set forth in the Plan.

## II
## THE CHAPTER 11 DEBTOR

**2.01 The Plan Proponent.**  This Plan is proposed by Lattice Communications, Inc., the Debtor herein.  The Debtor believes that the Plan as proposed is in the best interests of the creditors. It should be noted that the owners of the Debtor as of the Filing Date may be diluted and/or required to extend equity funding in order to retain their interests.

### 2.02 Background of Debtor and Events leading to Chapter 11 Filing.

Lattice Communications has two primary lines of business that it has been involved in since its inception. The first is data storage & management and the second is broadband communications. Lattice will narrow its offering of high-speed data communications as part of their restructuring.

#### Data Storage & Management

Since its inception in 1997, Lattice Communications has delivered solutions to its clients that center upon the management and storage of corporate computer data. Specific deliverable services have been the design and delivery of data backup and storage systems as well as disaster recovery services. Lattice continues to provide such services to a limited number of clients. Although storage management services is becoming a highly competitive area, Lattice personnel possess the skills necessary to remain effective in continuing to deliver services in this area. With adequate funding, data storage and management represents the most promising opportunity for growth.

#### Broadband Communications

In addition to its data storage and management line of business, Lattice became involved in broadband communications as a vehicle to enhance its data storage and management business in April of 1999. In doing so, Lattice became an Internet Service Provider (ISP) or reseller partner of a competitive local exchange carrier (CLEC) called NorthPoint Communications, Inc. (NorthPoint) at that time. According to the terms of that relationship, Lattice would lease digital subscriber line (DSL) circuits from NorthPoint and bundle those circuits with additional services for sale to corporate clientele. Lattice entered into similar agreements with incumbent local exchange carriers (ILEC) including Southwestern Bell, Pacific Bell, Alltel, Fort Bend Communications (TXU), and Verizon. Lattice has divested itself entirely of all non-profitable DSL services. The remaining focus will be on dedicated T1 circuits to high-end business customers.

#### Events Leading to Bankruptcy

Like hundreds of other ISP partners reselling DSL services, Lattice relied on its wholesale sources for DSL circuits. While Lattice maintained several different sources for wholesale circuits, only the DSL circuits from CLEC sources allowed for enough profit margin to maintain profitability. DSL lines from ILEC sources proved to be unprofitable because of intense price competition with the ILEC's themselves and the shrinking margins associated with those circuits. NorthPoint became the primary supplier of wholesale DSL services for Lattice.

In January of 2001, NorthPoint filed a petition under Chapter 11 of the United States Bankruptcy Code. Like many other CLEC's, NorthPoint was unable to raise additional investment capital to fund losses. NorthPoint began the search for an acquirer but, after about 60 days, was unable to attract a suitor that was willing to maintain operations and unexpectedly announced the sale of its assets to AT&T. As a result of the asset sale, NorthPoint would shut down its network effective April 19th, 2001. As a result, Lattice was forced to seek another wholesale CLEC that could provide DSL service at prices that would allow Lattice to work towards becoming a profitable company. At this time, Lattice signed an ISP partner agreement with Rhythms NetConnections, Inc. (Rhythms) for wholesale DSL services. This agreement would allow Lattice to transfer its existing NorthPoint client base to the Rhythms Network with minimum interruption of service to its clients. Unfortunately, because of a cumbersome administrative process, the majority of Lattice's clients experienced 30 – 45 days of service interruption and many felt compelled to seek service from other service providers. During this 30 – 45 day period, Lattice experienced a loss of revenue from all of its NorthPoint DSL customers. Of those, nearly 25% never returned as customers after Lattice made the successful transition to the Rhythms network. Although it experienced a significant loss of revenue during this period and bore significant cost in the transition from NorthPoint to Rhythms, Lattice was in a position to stabilize and move forward with its business.

At this time, Lattice stepped up efforts to raise additional investment capital and began to explore the possibility of a merger with or acquisition by another company that had a similar line of business. Lattice management identified three such candidates and began preliminary discussions with those companies in early May. Unfortunately, the investment community began a shift away from telecommunications investments and Lattice had little success in attracting additional investment. Without additional capital, Lattice would be unable to maintain the growth necessary to achieve the critical mass needed for profitability. At this time, Lattice also increased efforts to shift its business more towards data storage and management and to rely less on broadband communications. Lattice established early strategic relationships with vendors of storage management software and had developed a business plan to rejuvenate its efforts in this area; the availability of capital for data storage and management was far greater than it was in broadband communications. This appeared to be the most promising strategy towards additional investment and long term growth. Lattice had attracted significant attention from the three potential acquirers and was in discussion to sell off parts of its DSL client base to a successful bidder. By selling its money-losing DSL business to a company and focusing on its data storage and management business, Lattice management believed that the company would be in a position to attract the additional capital necessary to execute a successful growth strategy.

Unfortunately, on August 2, 2001 Rhythms NetConnections voluntarily filed a Plan of Reorganization under Chapter 11. On August 10th, Rhythms sent out a 31-day service termination notice to all of its partners and customers. Although Lattice was able to maintain its client base and continue offering services despite the heavy cost of the NorthPoint-to-Rhythms transition, another transition was out of the question. Lattice did not have the financial resources to finance another migration and Lattice's client base had lost all confidence in the CLEC wholesale provider's ability to supply Lattice with a stable and reliable DSL product. Compounding the lack of confidence was

the pressure in the client base to reduce costs on non-essential services. The impending loss of Rhythms service was a considerable factor in Lattice's major clients to seek other forms of broadband service and reduce costs. On August 29, 2001 Lattice Communications, too, voluntarily filed for restructuring under Chapter 11.

**2.03 Post Bankruptcy Operation of the Debtor.**  Since the filing of the current Chapter 11 proceedings, the management of Lattice Communications, Inc., has attempted to identify areas to increase profitability and ways to reduce operating expenses.

At the time the Debtor entered into the Bankruptcy, it owed employees, taxing authorities, secured debt to banks and others, and various unsecured debts.  A summary of the Debtor's debts owing as of the date of filing the petition is as follows:

| | |
|---|---:|
| Priority Tax Debts | $ 17,575.00 |
| Secured Debt | $ 569,963.00 |
| Unsecured Debts | $ 1,510,779.00 |

Due to the ongoing accrual of post-petition expenses and the inability of the company to operate profitably it was decided by the Debtor's management to reduce operations significantly. Debtor has substantially reduced operations.  Debtor has divested itself of all DSL services including all remote connectivity services to major corporations.  Debtor has moved operations from its offices at 11811 North Freeway, Houston, Texas to its network operations center (NOC) at Level 3 in Houston.  Debtor has trimmed staff to one manager, one bookkeeper and one technical support person.  Debtor has rejected its office space contract as well as all other non-profitable contracts.  Debtor has retained only business T1 and ISDN customers.  These reductions in operational expenses have lessened the accrual of post-petition liabilities; with the reductions, Debtor has been able to operate profitably and maintain its post-petition obligations.

**2.04 Status of the Debtor's Assets.** .  The primary assets of the Debtor are  receivables less than 90 days old at the time of filing.

The assets remaining in the estate are receivables.  Debtor is continuing in its efforts to collect receivables.  Debtor believes that only receivables less than 90 days old  at filing date, have a realistic chance of being collected.

| | Aug. 29, 2001 | Sept., 2001 | Oct., 2001 | Nov., 2001 | Dec., 2001 | | |
|---|---|---|---|---|---|---|---|
| 0-30 Days | 78,109 | 43,453 | 44,738 | 14,324 | 17,567 | | |
| 31-60 Days | 44,023 | 36,635 | 23,948 | 30,942 | 12,669 | | |
| 61-90 Days | 17,863 | 47,622 | 21,481 | 14,467 | 23,727 | | |
| 91+ Days | 34,370 | 48,285 | 70,260 | 60,671 | 38,884 | | |
| Totals | 174,365 | 175,995 | 160,427 | 120,404 | 92,847 | | |

**2.05 Anticipated Management And Projected Operations of Debtor.** As the Debtor's Plan of Reorganization calls for continued operation of the Debtor, there will be post-confirmation operation of the business. The anticipated future management of Debtor is as follows:

**Management of Debtor:**

Richard Koseluk, President
Compensation - contract which provides for employment for 3 years, health insurance and normal reimbursement of business related expenses, with a salary of $100,000 per year.
Responsibilities - Richard Koseluk is in charge of US operations of Debtor's business internet services. In addition he has primary responsibility to negotiate and approve new business and expansion opportunities. Mr. Koseluk will oversee the operation and management of the Debtor. Mr. Koseluk will also be responsible for making distributions to the Debtor's creditors as provided in this plan. Mr. Koseluk will draw a salary from the Debtor post-confirmation and will be reimbursed for any out-of-pocket expenses incurred on behalf of the Debtor.

The Debtor may employ subject to Bankruptcy Court approval, an accountant or other professionals if necessary to assist in finalizing the Debtor's financial records and operating reports.

**Projected Operations of Debtor:** See attached **Exhibit "A."**

### III.
### SUMMARY OF THE PLAN

The following is a brief summary of certain provisions of the proposed Plan of Reorganization provided to assure that the creditors affected by the Plan understand its provisions. This summary should not be considered a solicitation for acceptance of that Plan. Additionally, creditors should not rely on this summary to decide whether or not to vote in favor of or against the Plan, but are expressly referred to the Plan itself since it contains many provisions which will not be summarized herein.

The Plan proposes payment of claims from the ongoing operations of the Debtor.

**3.01 Classification and Treatment of Creditors.** The Debtor's Plan of Reorganization will provide for classification of creditors in accordance with the United States Bankruptcy Code.[1]

---

[1] The Debtor reserves the right to dispute all of the claims listed in the following sections of the Disclosure Statement. Debtor's listing of estimated claim amounts is for informational purposes only and are not binding on the Debtor in future claim objection proceedings.

**Class 1 - Administrative Expenses.**  Class 1 is unimpaired. Class 1 are Claims entitled to priority by Section 507(a)(1) of the Bankruptcy Code. All claims in this class shall be paid in cash and in full when such claims are allowed and approved by the Court after the Effective Date.  All pre-confirmation quarterly fees assessed pursuant to 28 U.S.C. §1930(a)(6) shall be paid on or before the Effective Date.  The Reorganized Debtor shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing this chapter 11 case, or enters an order either converting this chapter 11 case to a case under chapter 7 or dismissing this chapter 11 case. After confirmation, the Reorganized Debtor shall file with the Bankruptcy Court and shall serve on the United States Trustee a financial report for each quarter, or portion thereof, that this chapter 11 case remains open in a format prescribed by the United States Trustee.

**Class 2 - Allowed Priority Wage Claims** Class 2 is unimpaired.  Class 2 shall receive payments under the Plan for wages earned during the three months prior to the Date of the Petition, in an amount not to exceed $4,000.00 pursuant to 11 U.S.C. § 507(a)(3).  The scheduled Class 2 Claim is:

| Employee | Eligible Earnings Period 5/29/01-8/29/01 | Amount Not to Exceed $4,000.00 pursuant to 11 U.S.C. § 507(a)(3) |
|---|---|---|
| Charles H. White | $2,083.00 | $2,083.00 |

**Class 3 - Allowed Priority Tax**. Class 3 is unimpaired.  All claims in this class shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(c) when such claims are allowed and approved by the Court after the Effective Date.  Class 3 claims will be paid in full over the course of four years in monthly payments in the amount of $364.00.  The scheduled Class 3 Claim is:

| Claim No. 10 , filed 11/19/01, for the tax period of 6/01/01 to 8/29/01. | Texas Comptroller of Public Accounts | $17,500 32 |
|---|---|---|

**Class 4 - Allowed Secured Claims.**  Class 4 is impaired. Class 4 shall retain its pre-petition and post-petition liens in and to all of the assets of the Debtor and its estate.  The Debtor will voluntarily surrender all collateral in its possession securing the respective secured parties claims. Thereafter, any  deficiency owing to a Class 4 Claimant after the liquidation or return of their collateral shall be treated as a Class 5 Claim.

**Class 5 - Allowed Unsecured Claims.**  Class 5 is impaired.  Class 5 consists of allowed unsecured claims over $100.00.  The claims in this class total approximately $1,510,779.00.  Class 5 claimants  will be paid ten cents ($.10) on the dollar of their claim over four (4) years without interest or penalty in pro-rata monthly payments by the Debtor of $2,916.00.

**Class 6 - Equity Interest Holders.**   Class 6 is impaired.  Class 6 consists of the shareholders of the Debtor.  Shareholders will retain shares.

**3.02  Retention of Jurisdiction.** Notwithstanding confirmation of the Plan, The Bankruptcy Court shall retain the exclusive jurisdiction over the Reorganization Case for the following purposes:

(a) to determine any and all objections to the allowance of Claims and Equity Security Interests;

(b) to determine any and all pending applications for the rejection or assumption of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine, and if necessary to liquidate, any and all Claims arising therefrom;

(c) to determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the Effective Date, or instituted by the Debtor after the Effective Date, including, without limitation, any Claims arising under the Bankruptcy Code to avoid any preferences, fraudulent conveyances or other voidable transfers;

(d) to consider any modifications of the Plan, any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation order;

(e) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or the execution and delivery of any Plan exhibit;

(f) to issue such orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code;

(g) to determine such other matters which may be set forth in the Confirmation order or which may arise in connection with the Plan or the Confirmation order; and

(h) to determine any and all pre-confirmation applications for allowances of compensation, entitled to priority under §507(a)(1) of the Code; and reimbursement of expenses and any other pre-confirmation fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan.

**3.03  Discharge of Debtor**. The rights afforded in the Plan and the treatment of all Creditors and holders of Equity Security Interests herein shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Equity Security Interests of any nature whatsoever. Except as otherwise provided herein, upon the Effective Date, all such Claims against or Equity Security interests in the Debtor shall be satisfied, discharged and released in full. All entities shall be precluded from asserting against the Debtor, its respective successors or its assets or properties any

other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

**3.04  Title to Assets: Discharge of Liabilities.** Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties dealt with by the Plan shall vest in the Reorganized Debtor, in accordance with Section 1141 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances; and the Confirmation order shall be a judicial determination of discharge of the liabilities of the Debtor, except as provided in the Plan.

**3.05  Forfeiture.** The Debtor shall make distributions to Creditors at the addresses set forth on the Proofs of Claim filed by such Creditors or at their last-known addresses if no Proof of Claim is filed or if the Debtor has been notified of a change of address. If any Creditor's distributions are returned as undeliverable, no further distributions to such Creditor shall be made unless and until notification is received of such Creditor's then current address, at which time, all missed distributions shall be made to such Creditor, without interest. The Debtor shall be under no obligation to locate or contact any Creditor. All Claims for undeliverable distributions shall be made on or before the second anniversary of the Confirmation Date. Until such time, undeliverable distributions shall be retained in an interest-bearing account. After such date, all unclaimed payments shall be disbursed to any remaining Allowed Claims and the Claim of any Creditor with respect to such payments shall be discharged and forever barred.

**3.06 Bar Dates For Filing Proofs Of Claim** . The Debtor has filed as a part of its schedules a list of all creditors, setting forth the identity of each such creditor and an indication of the amount due each such creditor. Unless a claim is listed as disputed, contingent or unliquidated, each creditor's claim will be allowed in the amount and status stated on the their schedules in absence of filing of a proof of claim in a different amount or status on or before the expiration of 90 days from the date first set for meeting of creditors. The Meeting of Creditors was held October 18, 2001. Claims listed as disputed, contingent, or unliquidated will not be allowed unless a proof of claim with all supporting documents is filed on or before January 16, 2002. In the event a creditor has filed a proof of claim in these proceedings with which the Debtor disagrees or upon audit, the Debtor disagrees with the amount previously stated by the Debtor in its schedules, the Debtor shall file an objection to said claim as designated in the Post Confirmation Certificate.

Any proof of claim which is not timely filed shall be of **no** force and effect. No distribution will be made to any creditor that has not timely complied with this provision.

### IV.
### CONFIRMATION PROCEDURES AND STANDARDS

In order for the Plan to be confirmed, various statutory conditions must be satisfied, including (i) a finding by the Court that the Plan is feasible, (ii) the acceptance of the Plan by at least one impaired class entitled to vote on the Plan not counting insiders, and (iii) provision for payment or distribution to each claimant under the Plan of money and/or other property equal in value to at least

what the claimant would have received in liquidation or, with respect to each Class, either acceptance by the Class or a finding by the Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against the Class.

**4.01  Who May Vote**   Distributed along with this Disclosure Statement is a ballot on which Creditors and interest holders can vote to accept or reject the Plan.  Only classes that are impaired under the Plan are entitled to vote on acceptance or rejection of the Plan. Generally, Section 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest. In addition, these classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of the debtor or the commencement of the Chapter 11 case, have been cured and the holders of the claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance or any contractual provisions or applicable law to demand accelerated payment.

Any claim that is subject to an unresolved objection may not vote unless an order is obtained from the Court temporarily allowing the Claim for the purpose of voting. Any party in interest may object to a Claim.

Classes not impaired under the Plan, pursuant to section 1126(f) of the Bankruptcy Code, are deemed to have accepted the Plan without voting. All impaired classes under the Plan are entitled to vote to accept or reject the Plan.

**4.02  Confirmation of the Plan.**   Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

**(a) Confirmation Hearing**.   Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Court will schedule the Confirmation Hearing, set deadlines and require notice to all creditors.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan, regardless of whether it is entitled to vote.

**(b) Objections to Confirmation**.   The Court will schedule a hearing to consider objections by parties in interest to confirmation of the Plan. **THE HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE HEARING.** While the Plan Proponent expects that any hearing to consider objections to the confirmation of the Plan will be held in conjunction with the Confirmation Hearing, there can be no assurance that such will be the case. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY MADE IT MAY NOT BE CONSIDERED BY THE COURT**.

**4.03  Requirements for Confirmation of the Plan**.  At the Confirmation Hearing, the Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Court will enter an order confirming the Plan. These requirements are as follows:

**(a) Feasibility of the Plan**. In order for the Plan to be confirmed, the Court must determine that a further reorganization or subsequent liquidation of the Debtor is not likely to result following confirmation of the Plan. The Plan Proponent believes that the Plan is feasible. All payments under the Plan are to be made out of assets already on hand (i.e., inventory and receivables) or reasonably anticipated from continued operation of the Property.

**(b) Best Interests Test**. With respect to each impaired class contemplated by Section 1129(a)(7)(A), each member must either (a) accept the Plan or (b) receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount the holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To determine what the holders in each impaired class of Claims and Interests would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of that Proponent's assets and properties in a context of Chapter 7 liquidation case. The cash amount that would be available would consist of the proceeds resulting from the disposition of the assets of the Debtor, reduced by the costs and expenses of the liquidation and by such additional administration and priority expenses that may result from the termination of the Debtor's business and use of Chapter 7 for the purposes of liquidation.

The costs of liquidation under Chapter 7 would include the fees payable to the trustee appointed in the Chapter 7 case, as well as those that might be payable to additional attorneys and other professionals that the trustee might engage. Costs of liquidation would also include any unpaid expenses incurred by the Debtor during the Chapter 11 case, such as compensation for attorneys, financial advisors, and accountants and costs and expenses of any committed, that are allowed in the Chapter 7 case. In addition, Claims may arise by reason of the breach of or rejection of obligations incurred and executory contracts entered into by the Debtor during the pendency of the Chapter 11 case.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the Proponent's assets and properties (after subtracting the amounts attributable to the claims described above) are then compared with the present value offered to each of the cases of Allowed Claims and Allowed Interests under the Plan.

In applying the "best interests" test, it is necessary to consider that Claims and Interests in a Chapter 7 case might not be classified in the same manner as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all allowed unsecured claims which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from a Chapter 7 case of the Proponent. The distribution of the liquidation proceeds would be calculated pro rata according to the amount

of the allowed unsecured claim held by each Creditor in the class. The Plan Proponent believes that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior class of Creditors would receive any distribution until all senior classes of Creditors were paid in full with interest, and no Interest Holder would receive any distribution until all Creditors were paid in full with interest. Consequently, the Plan Proponent believes that in any Chapter 7 case holders of Claims in all of the Classes would receive less than under the Plan.

In this case a Chapter 7 liquidation would likely result in most assets of the estate being lost to secured creditors. Specifically, the Debtor's real property, receivables and equipment would likely be foreclosed upon resulting in no distribution to unsecured creditors. This Plan of Reorganization provides for the ongoing operation of the Debtor by management which is familiar with the Debtor in order to generate revenues sufficient to pay the creditors as provided in the Plan. Therefore, the return to creditors will likely be higher under the Plan as proposed by the Debtor.

(c) **Acceptance by Impaired Classes**. Section (a)(8) of the Bankruptcy code requires that, subject to the "cram-down" exception contained in section 1129(b), each impaired class must accept the Plan by the requisite votes for confirmation to occur. A class of impaired claims will have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in the class voting to accept or reject the Plan have voted in favor of acceptance. A class of impaired Interests will have accepted the Plan if at least two-thirds in amount of the Allowed Interests in the class voting to accept or reject the Plan have voted in favor of acceptance. In addition, regardless of whether recourse is had to the cram-down provisions of section 1129(b), at least one impaired class must accept the Plan, without counting the votes of any "insiders" contained in the class, as defined in Section 101(2) of the Bankruptcy Code.

(d) **Cram-down**. If any impaired class of claims or interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Proponent pursuant to the cram-down provisions of Section 1129(b) if, as to such impaired class, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that class. A Plan does not discriminate unfairly if no class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for secured claims, unsecured claims and interests.

With respect to a secured claim, "fair and equitable" means that either (i) the impaired secured creditor retains its liens to the extent of its allowed secured claims and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the Effective Date of the Plan at least equal to the value of the creditor's interest in the property securing its liens, (ii) property subject to the lien of an impaired secured creditor is sold free and clear of the lien, with the lien attaching to the proceeds of the sale, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Plan. With respect to an unsecured claim, "fair and equitable" means that either (i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the Plan.

With respect to an interest, "fair and equitable" means that either (i) each holder of an impaired interest in the class receives or retains property of a value equal to the greatest of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of that interest or (iii) the holders of all interests that are junior to the interest of the dissenting class will not receive any property under the Plan.

The Bankruptcy Court must determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any impaired class of Claims or Interests. The Plan Proponent believes that each holder of a Claim impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date of an amount not less than the amount likely to be received if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code. The Plan Proponent believes that the values reflected in the Liquidation Analysis represent the most likely result in the event of a liquidation of these assets in a Chapter 7 case and believes that the likelihood that a liquidation of these assets would yield going concern values is highly remote. At the Confirmation Hearing, the Bankruptcy Court will determine whether Creditors would receive greater distributions in a liquidation under Chapter 7 than they would under the Plan.

### 4.04  Voting Procedures.

(a) **Counting Votes**. In order to be counted, a ballot must be RECEIVED at the following address no later than the date set by the Bankruptcy Court.

> United States Bankruptcy Court
> District Clerk's Office
> 515 Rusk St.
> Houston, TX  77002
>
> Richard L. Fuqua
> FUQUA & KEIM, L.L.P.
> 2777 Allen Parkway, Suite 480
> Houston, TX 77019

The Plan Proponent will tabulate the votes.

(b) **Solicitation of Votes**. The Ballot included herewith will serve as the ballot for indicating acceptance of the Plan pursuant to the requirements of Section 1125 and 1226 of the Bankruptcy Code and Bankruptcy Rule 3018(c). Section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3018 govern the solicitation and the binding effect of acceptances. Any holder of a contested Claim may ask the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, to have its Claim or Interest allowed for the purpose of accepting or rejecting the Plan.

## V.
## SOURCE OF INFORMATION FOR THIS DISCLOSURE STATEMENT

The information contained herein has not been subject to a certified audit. Most of the information, descriptions, values and facts contained herein are derived from in house accounting staff, management of the Debtor, and unverified opinions of third parties. Accordingly, the Debtor does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate. This Disclosure Statement does not contain the Plan in its entirety, the Plan itself which is controlling in the event of any inconsistencies. Each creditor is urged to review the Plan prior to voting.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein and the delivery of this Disclosure Statement shall not under any circumstances create an implication that there has not been any change in the facts as set forth herein since the date hereof. All the terms herein have the same meanings as in the Plan unless the context requires otherwise.

## VI.
## DISCLAIMER

The ability of Debtor to achieve its projections is subject to substantial risks, including the general state of the economy. Therefore, any projections prepared by the Debtor do not constitute and should not be construed as guaranties of results.

## VII.
## PROFESSIONAL FEES

Upon filing the Debtor's Chapter 11 case, the law firm of Fuqua & Keim, L.L.P. was engaged on a general retainer to represent Debtor. The Court has approved the engagement. Debtor's counsel has not previously filed for interim application for compensation. Debtor's legal fees owed to Fuqua & Keim as of January 16, 2002 are $28,454.54 which fees are subject to approval by the Bankruptcy Court. It is anticipated that an additional $5,000.00 in attorneys fees will be incurred in the course of representation of Debtor through Plan Confirmation. Fuqua & Keim, L.L.P., was paid a pre-petition retainer in the amount of $35,000.00.

## VIII.
## PENDING LITIGATION

### 8.01 General

No litigation is currently pending or under investigation by Debtor.

### 8.02 Fraudulent and Preferential Transfers

Debtor is not aware of any preferential transfers to insiders that occurred by reason of distributions within the year prior to filing bankruptcy.

## IX.
## ALTERNATIVES TO THE PLAN PROPOSED

The Debtor expects that the Plan will enable it to realize the most benefit for all of its creditors. However, if the Plan is not confirmed, the Debtor may continue to seek other avenues for Reorganization.

**CONVERSION:** In the event no suitable alternative could be found, the Debtor would be compelled, as well as obligated, to recommend the conversion of the Chapter 11 case to a case under Chapter 7, and a subsequent liquidation by a duly appointed or elected Chapter 7 trustee. Although the Debtor is of the opinion that a straight liquidation of the assets would not be in the best interest of the creditors generally, the following is likely to occur:

(a) The newly appointed Chapter 7 trustee would have to become familiar with the Debtor's operations in order to evaluate all the Debtor's assets and liabilities, including the numerous claims which are the subject of pre-petition litigation and all transactions which will serve as a basis for future litigation;

(b) In addition to the duplication of efforts that would transpire as a result of the Chapter 7 trustee having to review documents and interview persons in order to become sufficiently acquainted with Debtor's business, the Chapter 7 trustee would likely retain professionals to aid in administering the estate;

(c) An additional tier of administrative expenses entitled to priority over general unsecured claims would be incurred. Such administrative expenses would include Chapter 7 trustee's commissions and fees for the professionals likely to be retained; and

(d) There would likely be no distribution at all to the creditors until the case was ready to be closed. The Debtor will allow the creditors and parties-in-interest to draw their own conclusions with respect to the delay associated with such detriment. It is certain that the above factors would result in an additional dilution to the projected dividend. The Debtor believes that such a speculative projection should be made by the creditors themselves.

The Debtor believes if the assets of the Debtor were liquidated through a Chapter 7 trustee there would be an 0% dividend to the unsecured creditors, as opposed to the Debtor's Plan which will result in a payment to unsecured creditors.

Dismissal of the proceeding would, in the judgment of Debtor, lead to an unsatisfactory result. Dismissal would result in numerous lawsuits to collect debts which would cause the Debtor to incur more expenses in the form of attorneys fees, etc.

The Debtor has attempted to set forth possible alternatives to the proposed Plan. Accordingly, one should recognize that a vote against the Plan and the ultimate rejection of the Plan would not alter the present status of the Debtor. The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance what turn the proceedings will take if the Plan is rejected. If you believe one of the alternatives referred to above is preferable to the Plan and you wish to urge it upon the Court, you should consult your counsel.

## X.
## FEDERAL INCOME TAX CONSEQUENCES

**(a) CREDITORS:** The Debtor believes that the following discussion generally sets forth the Federal income tax consequences to Creditors upon confirmation and consummation of the Plan. No ruling has been sought or obtained by the Debtor from the Internal Revenue Service ("IRS") with respect to any of these matters. The following discussion of Federal income tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect to the particular Federal income tax consequences to any Creditor.

**AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.**

Creditors may be taxed on distributions they receive from the Estate. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the Claim of each particular Creditor. The method of accounting utilized by a Creditor for Federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such Creditor distributes will be the difference between (1) the Creditor's basis for Federal income tax purposes, if any, in the Claim and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

**(b) DEBTOR TAX CONSEQUENCES**: According to the accountants of the Debtor, the Debtor is currently showing a net operating loss carry forward ("NOL")in excess of $500,000. Normally, NOLs can be used to offset ordinary operating income on a dollar for dollar basis. To the extent, however, that Claims are not paid and debts are forgiven as a result of this Plan, the Debtor would have to reduce its NOLs one dollar for each dollar of debt discharged under this Plan. Therefore, the actual amount of taxes which may be owed is too speculative for Debtor to be able to project.

## XI.
## MODIFICATION OF DISCLOSURE STATEMENT

The Debtor may propose amendments to or modification of this Disclosure Statement at any time prior to the confirmation, with leave of the Court. After confirmation, the proponent may, with the approval of the Court, so long as it does not materially or adversely affect the interests of the creditors or other parties- in-interest as set forth herein, remedy any defect or omission, reconcile any inconsistencies in this Disclosure Statement, or in the Order Confirming Disclosure Statement, in such a manner as may be necessary to carry out the purposes and intent of this Disclosure Statement.

## XII.
## DISCLOSURE REQUIRED BY THE BANKRUPTCY CODE

The Bankruptcy Code requires the disclosure to the Bankruptcy Court of payments made or promised of the kind as set forth in Section 1129(a)(5) of the Bankruptcy Code. The Debtor retained Fuqua & Keim, L.L.P., as bankruptcy counsel. Subject to Court approval, the Debtor has agreed to pay for necessary and reasonable services rendered by Debtor's Counsel in this bankruptcy case.

## XIII.
## OTHER BANKRUPTCIES

The Debtor has not filed a prior bankruptcy proceeding.

## XIV
## ASSUMPTION OF EXECUTORY CONTRACTS

**Contracts Rejected Unless Set Forth Below.** All executory contracts or unexpired leases to which the Debtor was a party on the Filing Date shall be deemed rejected, unless expressly incorporated in the list set forth below of contracts to be assumed, and/or in any motion for leave to assume or reject a particular executory contract on or before the entry of an order approving the Disclosure Statement for the Plan or such later time set by the Court at the request of the Debtor.

| Listing of Contracts | |
|---|---|
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 103/T1/HSTNTX0FN00/HSTOTX42DS0/TW<br><br>Type of Contract: PRI |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 108/T1/HSTNTX0FN00/HSTOTX42DS0/TW<br><br>Type of Contract: PRI |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/002804/TW - 2<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003151/TW - 8<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003513/TW - 11<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003514/TW - 12<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003515/TW - 13<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003516/TW - 14<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003521/TW - 15<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003534/TW - 16<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003535/TW - 17<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003541/TW - 19<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003543/TW - 18<br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118 | Contract No. 19/HCGS/003544/TW - 20 |

| | |
|---|---|
| Palatime, IL 60055-0118<br>888-333-0520 | Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003554/TW - 22<br><br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003571/TW - 23<br><br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 301/T3/HSTOTX42K00/HSTQTX02W03<br><br><br>Type of Contract: Hubbed DS3 for chan DS3 for 28 T1's |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003711/TW<br><br><br>Type of Contract: T1 |
| Time Warner Telecom<br>Dept CH10118<br>Palatime, IL 60055-0118<br>888-333-0520 | Contract No. 19/HCGS/003713/TW<br><br><br>Type of Contract: T1 |
| Level 3 Communications<br>1025 Eldorado Blvd.<br>Broomfield, CO 80021<br>877-453-8353 | Contract No. HSTQTX02-C11.02.018-00001<br><br><br>Type of Contract: Level 3 Cabinet 12.01 |
| Level 3 Communications<br>1025 Eldorado Blvd.<br>Broomfield, CO 80021<br>877-453-8353 | Contract No. HSTQTX02-C12.02.018-00001<br><br><br>Type of Contract: Level 3 Cabinet 12.02 |
| Level 3 Communications<br>1025 Eldorado Blvd.<br>Broomfield, CO 80021<br>877-453-8353 | Contract No. HSTQTX02-HSTQTX02-00491<br><br><br>Type of Contract: DS3 Xconnect for Channel DS3 |
| Level 3 Communications<br>1025 Eldorado Blvd.<br>Broomfield, CO 80021<br>877-453-8353 | Contract No. HSTQTX02-121974-0002<br><br><br>Type of Contract: Cross Roads port fee |
| Level 3 Communications<br>1025 Eldorado Blvd.<br>Broomfield, CO 80021<br>877-453-8353 | Contract No. HSTNTXOF-TSTQTX02-0005<br><br><br>Type of Contract: DS3 to Lattice from L3 |
| Level 3 Communications<br>1025 Eldorado Blvd.<br>Broomfield, CO 80021<br>877-453-8353 | Contract No. HSTNTX02-HSTQTX02-00647<br><br><br>Type of Contract: OC-3 X-connect SWB Native lan |
| Southwestern Bell<br>P.O. BOX 4706<br>Houston, TX 77210-4706<br>800-559-7928 | Contract No. 45.HTGJ.000140.SUV<br><br><br>Type of Contract: SWB NLAN to Mitsu |
| Southwestern Bell<br>P.O. BOX 4706<br>Houston, TX 77210-4706<br>800-559-7928 | Contract No. 45.HTGJ.000148.SUV<br><br><br>Type of Contract: SWB NLAN to Lattice |
| Southwestern Bell<br>P.O. BOX 4706<br>Houston, TX 77210-4706<br>800-559-7928 | Contract No. 28/OBGS/703123/SW<br><br><br>Type of Contract: NLAN CID at Level 3 |
| The Guardian | Contract No. Account # 00670597 |

| | |
|---|---|
| P.O. BOX 2454<br>Spokane, WA 99210-2454<br>800-459-9401 | <br><br>Type of Contract: Dental Insurance |
| The Hartford<br>P.O. BOX 659519<br>San Antonio, TX 78265<br>800-447-7649 | Contract No. Policy 61UECLG5277<br><br><br>Type of Contract: Commercial Package |
| The Hartford<br>P.O. BOX 659519<br>San Antonio, TX 78265<br>800-447-7649 | Contract No. Policy 61UUCLK0510<br><br><br>Type of Contract: Business Owners |
| The Hartford<br>P.O. BOX 659519<br>San Antonio, TX 78265<br>800-447-7649 | Contract No. Policy 61WBCZK4445<br><br><br>Type of Contract: Workers Comp |
| The Hartford<br>P.O. BOX 659519<br>San Antonio, TX 78265<br>800-447-7649 | Contract No. Policy 61XHUYI4496<br><br><br>Type of Contract: Umbrella |

## XV.
## CONCLUSION

The Debtor believes that approval of its Plan will provide an opportunity for creditors to receive more through the proposed Plan on account of their claims than would be received in a straight liquidation by a trustee in a Chapter 7 case or from a distress sale of all the assets. If the Plan is not approved, the Debtor will continue to seek other reorganization alternatives, but liquidation might ensue, with the consequences as discussed above in relation to the liquidation alternative.

This Disclosure Statement is subject to the approval by the Bankruptcy Court after notice and hearing.

**THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

The Plan of Reorganization contains additional provisions and each creditor should review the provisions of the Plan with particularity.

Respectfully submitted January 3 1, 2002.

Lattice Communications, Inc.

By: _Richard H. Koseluk_

Richard Koseluk, President

OF COUNSEL:

FUQUA & KEIM, L.L.P.
Richard L. Fuqua
Texas Bar #07552300
Phillip H. Trueba
Texas Bar #24005582
2777 Allen Parkway, Ste. 480
Houston, Texas 77027

Telephone  (713) 960-0277
Facsimile  (713) 960-1064

# LATTICE COMMUNICATIONS, INC.
## DISCLOSURE STATEMENT EXHIBIT "A"

Accrual Basis

## Lattice Communications, Inc.
### Profit & Loss
2002 2003
Projected

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | |
| Income Services | 38,000 | 39,400 | 40,800 | 42,200 | 43,600 | 45,000 | 46,400 | 47,800 | 49,200 | 50,600 | 52,000 | 53,400 | 54,800 | 56,200 | 57,600 |
| **Total Income** | 38,000 | 39,400 | 40,800 | 42,200 | 43,600 | 45,000 | 46,400 | 47,800 | 49,200 | 50,600 | 52,000 | 53,400 | 54,800 | 56,200 | 57,600 |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | |
| Circuit Costs | 23,618 | 24,218 | 24,818 | 25,418 | 26,018 | 26,618 | 27,218 | 27,818 | 28,418 | 29,018 | 29,618 | 30,218 | 30,818 | 31,418 | 32,018 |
| **Total COGS** | 23,618 | 24,218 | 24,818 | 25,418 | 26,018 | 26,618 | 27,218 | 27,818 | 28,418 | 29,018 | 29,618 | 30,218 | 30,818 | 31,418 | 32,018 |
| **Gross Profit** | 14,382 | 15,182 | 15,982 | 16,782 | 17,582 | 18,382 | 19,182 | 19,982 | 20,782 | 21,582 | 22,382 | 23,182 | 23,982 | 24,782 | 25,582 |
| **Expense** | | | | | | | | | | | | | | | |
| **Employee Salaries** | | | | | | | | | | | | | | | |
| Operations | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 |
| Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 5,000 | 5,000 |
| Administrative | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **Total Employee Salaries** | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 13,333 | 18,333 | 18,333 | 18,333 |
| **Employee Benefits** | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 1,100 | 1,100 | 1,100 |
| **P/R Taxes Fed W/H ER** | | | | | | | | | | | | | | | |
| Operations | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 |
| Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Administrative | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 313 | 313 | 313 |
| P/R Taxes Fed W/H ER - Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 156 | 156 | 156 |
| **Total P/R Taxes Fed W/H ER** | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 1,146 | 1,146 | 1,146 |
| **Business Entertainment** | | | | | | | | | | | | | | | |
| Administrative | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 500 | 500 | 500 |
| **Total Business Entertainment** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 500 | 500 | 500 |
| **Cellular Telephones** | | | | | | | | | | | | | | | |
| Administrative | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 300 | 300 | 300 |
| **Total Cellular Telephones** | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 300 | 300 | 300 |
| Repayment of Pre-Petition | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 |
| Telephone Expense | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 140 | 140 | 140 |
| Office Rent | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 1,000 | 1,000 | 1,000 |
| Postage | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 125 | 125 | 125 |
| **Total Expense** | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 19,311 | 25,924 | 25,924 | 25,924 |
| **Net Ordinary Income** | (4,929) | (4,129) | (3,329) | (2,529) | (1,729) | (929) | (129) | 671 | 1,471 | 2,271 | 3,071 | 3,871 | (1,942) | (1,142) | (342) |
| **Net Income** | (4,929) | (4,129) | (3,329) | (2,529) | (1,729) | (929) | (129) | 671 | 1,471 | 2,271 | 3,071 | 3,871 | (1,942) | (1,142) | (342) |
| **Cumulative Profit (Loss)** | (4,929) | (9,059) | (12,388) | (14,917) | (16,646) | (17,576) | (17,705) | (17,034) | (15,564) | (13,293) | (10,222) | (6,352) | (8,293) | (9,435) | (9,777) |

Accrual Basis

# Lattice Communications, Inc.
## Profit & Loss
### 2002 2003
### Projected

| | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | |
| **Income** | | | | | | | | | |
| Income Services | 59,000 | 60,400 | 61,800 | 63,200 | 64,600 | 66,000 | 67,400 | 68,800 | 70,200 |
| **Total Income** | 59,000 | 60,400 | 61,800 | 63,200 | 64,600 | 66,000 | 67,400 | 68,800 | 70,200 |
| **Cost of Goods Sold** | | | | | | | | | |
| Circuit Costs | 32,618 | 33,218 | 33,818 | 34,418 | 35,018 | 35,618 | 36,218 | 36,818 | 37,418 |
| **Total COGS** | 32,618 | 33,218 | 33,818 | 34,418 | 35,018 | 35,618 | 36,218 | 36,818 | 37,418 |
| **Gross Profit** | 26,382 | 27,182 | 27,982 | 28,782 | 29,582 | 30,382 | 31,182 | 31,982 | 32,782 |
| **Expense** | | | | | | | | | |
| **Employee Salaries** | | | | | | | | | |
| Operations | 10,833 | 10,833 | 10,833 | 14,833 | 14,833 | 14,833 | 14,833 | 14,833 | 14,833 |
| Sales | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Administrative | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **Total Employee Salaries** | 18,333 | 18,333 | 18,333 | 22,333 | 22,333 | 22,333 | 22,333 | 22,333 | 22,333 |
| **Employee Benefits** | 1,100 | 1,100 | 1,100 | 1,340 | 1,340 | 1,340 | 1,340 | 1,340 | 1,340 |
| **P/R Taxes Fed W/H ER** | | | | | | | | | |
| Operations | 677 | 677 | 677 | 927 | 927 | 927 | 927 | 927 | 927 |
| Sales | 313 | 313 | 313 | 313 | 313 | 313 | 313 | 313 | 313 |
| Administrative | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 |
| P/R Taxes Fed W/H ER - Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total P/R Taxes Fed W/H ER** | 1,146 | 1,146 | 1,146 | 1,396 | 1,396 | 1,396 | 1,396 | 1,396 | 1,396 |
| **Business Entertainment** | | | | | | | | | |
| Administrative | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| **Total Business Entertainment** | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| **Cellular Telephones** | | | | | | | | | |
| Administrative | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| **Total Cellular Telephones** | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Repayment of Pre-Petition | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 |
| Telephone Expense | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 |
| Office Rent | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Postage | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Total Expense** | 25,924 | 25,924 | 25,924 | 30,414 | 30,414 | 30,414 | 30,414 | 30,414 | 30,414 |
| **Net Ordinary Income** | 458 | 1,258 | 2,058 | (1,632) | (832) | (32) | 768 | 1,568 | 2,368 |
| **Net Income** | 458 | 1,258 | 2,058 | (1,632) | (832) | (32) | 768 | 1,568 | 2,368 |
| **Cumulative Profit (Loss)** | (9,319) | (8,060) | (6,002) | (7,634) | (8,466) | (8,498) | (7,729) | (6,161) | (3,793) |